IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID IRWIN,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      1:14-cv-00557
                                      )
FEDERAL EXPRESS CORPORATION,          )
                                      )
            Defendant.                )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This case involves multiple claims by David Irwin arising from the termination of his employment by Defendant Federal Express Corporation ("FedEx"). Both parties have moved for summary judgment. Irwin seeks summary judgment on his claims for breach of contract and violations of the North Carolina Wage and Hour Act ("WHA"), N.C. Gen. Stat. § 95-25.1 et seq. (Doc. 56.) FedEx seeks summary judgment on all of Irwin's claims, which also include claims for violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, and common law fraud. (Doc. 58.) For the reasons set forth below, the court will grant FedEx's motion as to Irwin's claims under the UDTPA, the WHA, and for common law fraud. Because a genuine dispute of material fact exists as to the breach of contract claims, the parties' cross motions for summary judgment will be denied.

## I. BACKGROUND

The parties have submitted an extensive record. In short, it reflects the following:

In 1999, FedEx acquired an air freight forwarding company then renamed Caribbean Transportation Services ("CTS"). (Doc. 7, ¶ 5; Doc. 57-2 at 6.) Irwin was one of CTS's three officers and, after the acquisition, became its senior vice president. (Doc. 7, ¶ 5; Doc. 57-2 at 6.)

Around June 1, 2009, FedEx merged with CTS, turning CTS into a division of FedEx, now named FedEx Latin America. (Doc. 57-2 at 5-6.) As a result of the merger, many positions were eliminated — including Irwin's. (Doc. 7, ¶ 6.) Irwin began negotiating a severance package with FedEx but stopped when the president of FedEx Latin America persuaded him to remain employed as managing director of Caribbean operations. (Id.)

In late 2012, FedEx sought to reduce costs and announced a voluntary buyout program – which it shorthanded as "VBO" - to be offered to selected employees. (Doc. 57-7 at 12; Doc. 57-8 at 1-3; Doc. 63-4 at 1-67.) As part of that program, in February 2013, FedEx offered, and Irwin signed, a "Confidential Severance Agreement General Release and Waiver" (the "Agreement"). (Doc. 63-4 at 61-67.) He signed this Agreement after his supervisor, Julio Columba, told him that FedEx "would likely be going through a restructuring process" and that Irwin's employment "may be in

2

immediate jeopardy if the agreement was not signed." (Doc. 7, ¶ 8; Doc. 63-1 at 11-12.)

Under the Agreement, Irwin made several promises, including to continue working for FedEx until November 30, 2013, and not to compete against the company for one year following the end of his employment. (Doc. 63-4 at 61-66.) "[I]n return for [Irwin's] promises contained in this Agreement," FedEx agreed, among other things, to pay him "severance benefits" of approximately $275,000 (comprising a $199,041.23 lump sum severance benefit, a $25,000 health reimbursement account payment, an annual incentive compensation ("AIC") bonus of $10,486, and a $40,000 prorated long term incentive payment).[1] (Doc. 7, ¶¶ 8, 14; Doc. 63-4 at 61-62.) The Agreement contained a provision that permitted Irwin to revoke the Agreement before the expiration of seven days, and further stated that "[o]nly when the revocation period has expired and the Agreement has been fully executed by both parties will the special severance payment be made by FEDEX as set forth in the Agreement." (Doc. 63-4 at 67.) The Agreement also provided in section 13(n): "[I]f after executing this Agreement, but prior to the effective date, [Irwin] engages in conduct or has performance deficiencies that would normally result in termination, he will be terminated

---

[1] The AIC and long term incentive amounts are not set forth in the Agreement but are based on Irwin's calculations. Irwin has since updated these figures to be $21,023.71 for the AIC bonus and $90,000 for the long term incentive bonus. (Doc. 58-8 at 3.)

3

and his Agreement will be null and void." (Id. at 66.) The Agreement did not define what conduct would "normally result in termination." (Id.; Doc. 7, ¶ 19.)

After the seven-day expiration period, FedEx Senior Vice President Connie Lewis Lensing sent Irwin a letter dated February 25, 2013, stating, "This confirms your signed Confidential Severance Agreement General Release and Waiver has been accepted. Your assigned departure date is November 30, 2013." (Doc. 63-4 at 68.)

Later, in the summer of 2013, FedEx invited Irwin to end his employment on August 31, 2013, rather than on November 30, 2013, as provided in the Agreement. (Doc. 63-6 at 7-8.) Irwin was told that this request came because of FedEx's desire "to get further savings from the VBO." (Doc. 58-5 at 4.) Irwin claims he was told that "if he accepted the offer, his Employment Agreement would be honored." (Doc. 7, ¶ 9.) Irwin declined the invitation, to ensure that the management transition "went smoothly." (Doc. 63-6 at 9.)

On October 31, 2013, Irwin's manager asked him to attend a meeting the next day, which Irwin thought could be for a retirement party. (Doc. 7, ¶ 10.) As it turned out, that next day Irwin was told that he was being suspended, but was not told why. (Doc. 57-1 at 6.) Roughly two weeks later, on November 14, Irwin was called into the office to meet with internal company auditors. (Doc. 7,

4

¶ 11; Doc. 57-3 at 7.) The auditors asked him about company operations occurring roughly five years earlier. (Doc. 7, ¶ 11.) Irwin explained that he was not involved in the matters they raised. (Id.)

Shortly thereafter, on November 27, 2013, FedEx informed Irwin that he would be terminated, effective November 29, 2013, and that the Agreement was "null and void in its entirety." (Doc. 57-4 at 49; Doc. 58-1 at 3; Doc. 63-6 at 25-26.) Irwin says that FedEx did not cite any "facts or evidence" for terminating him or for declaring the Agreement void (Doc. 7, ¶ 13), although he claims the company ultimately relied on the above-quoted section 13(n) of the Agreement (id., ¶ 18). Irwin denies ever having engaged in conduct that would "normally result in termination" under the terms of the Agreement. (Id., ¶¶ 19-20; Doc. 58-8 at 3.)

Irwin sought to review the evidence supporting his alleged misconduct so that he could respond, because he had so far carried "an unblemished record, with no prior warnings or write-ups of any kind." (Doc. 7, ¶ 15.) FedEx refused, and Irwin filed internal appeals, which FedEx denied. (Doc. 57-4 at 54.) According to Irwin, had he worked one more day, he would have been entitled to $275,000 in severance compensation under the Agreement. (Doc. 7, ¶ 14.)

Irwin alleges that he has honored all of his obligations under the Agreement and that FedEx has wrongfully refused to honor its

obligations. (<u>Id.</u> ¶ 21.) He filed this lawsuit initially in the Superior Court of Guilford County, North Carolina. (Doc. 1-2 at 1.) FedEx removed the action to this court based on diversity jurisdiction. (Doc. 1.) The complaint, following this court's ruling on a prior motion to dismiss (Doc. 14), now contains six claims for relief: two claims for breach of the employment contract; two claims for violations of North Carolina's WHA; one claim for violation of North Carolina's UDTPA; and one claim for common law fraud.

## II. ANALYSIS

Summary judgment is appropriate where the pleadings, affidavits, and other proper discovery materials demonstrate that no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-33 (1986). The party seeking summary judgment bears the burden of initially demonstrating the absence of a genuine dispute as to any material fact. <u>Celotex</u>, 477 U.S. at 323. If this burden is met, the nonmoving party must then affirmatively demonstrate a genuine dispute of material fact which requires trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). There is no issue for trial unless sufficient evidence favoring the nonmoving party exists for a factfinder to return a verdict for that party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-

50, 257 (1986).

In addition, the nonmoving party is entitled to have the "credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him." Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197 (4th Cir. 2005) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)) (initial quotation marks omitted). Because there are cross motions for summary judgment, the court must be careful to apply this test to each motion, thus viewing the evidence in the light most favorable to the non-moving party.

## A. Contract Claims

The parties dispute whether FedEx entered into a bilateral contract with Irwin or, alternatively, whether FedEx made a unilateral offer of payment to him in exchange for his performance of continued employment. In addition, even if either of the foregoing were to be proved, the parties dispute whether FedEx's termination of Irwin constituted a breach. The parties seem to agree, however, that in the absence of any contract between them, FedEx was free to terminate Irwin as an at-will employee.

### 1. Contract Formation

Irwin argues that the Agreement is binding under alternative legal theories: as a unilateral contract that was accepted by his performance (Doc. 59 at 8), and as a bilateral contract that FedEx

7

agreed to (Doc. 63 at 20). FedEx argues that the Agreement is a bilateral contract that is not binding because the company never executed it, and that Irwin's claims fail even under a unilateral contract theory because as the offeror, FedEx was free to withdraw the offer before its effective date. (Doc. 57 at 24-25.)

Because this case is based on the court's diversity jurisdiction, the choice of law rules of the forum state apply. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 495-97 (1941). For a contract claim, North Carolina's choice of law rule is *lex loci contractus* – the law of the place where the contract was formed. Fortune Ins. Co. v. Owens, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000). A contract is formed at the "place at which the last act was done by either of the parties essential to a meeting of the minds." Key Motorsports, Inc. v. Speedvision Network, LLC, 40 F. Supp.2d 344, 347 (M.D.N.C. 1999) (quoting Fast v. Gulley, 271 N.C. 208, 212, 155 S.E.2d 507, 510 (1967)).

Here, the parties negotiated the Agreement in North Carolina, where Irwin signed it and where it was allegedly accepted either through confirmatory communications to Irwin (if a bilateral contract) or by his performance (if a unilateral contract). Thus, the court will apply North Carolina law, as have the parties.[2]

---

[2] The Agreement provides that it "will be construed and interpreted in accordance with the laws of the State of Tennessee exclusive of its conflict of law provisions." (Doc. 63-4 at 66.) While North Carolina law recognizes a choice of law provision in a contract as long as the parties had "a reasonable basis for their choice and the law of the

For a valid contract to exist under North Carolina law, the three elements of offer, acceptance, and consideration must be present. Cap Care Grp., Inc. v. McDonald, 149 N.C. App. 817, 822-23, 561 S.E.2d 578, 582 (2002). "[P]arties may become bound by the terms of a [written] contract, even though they do not sign it, where their assent is otherwise indicated." Barnhouse v. Am. Exp. Fin. Advisors, Inc., 151 N.C. App. 507, 512, 566 S.E.2d 130, 133-34 (2002) (citations omitted). "The parties' intentions control [whether a contract exists,] and their intentions can be discerned from both their writings and actions." Arndt v. First Union Nat'l Bank, 170 N.C. App. 518, 522, 613 S.E.2d 274, 277-78 (2005) (upholding jury verdict in favor of the employee on his

---

chosen State does not violate fundamental public policy of the state or otherwise applicable law," Federated Fin. Corp. of Am. v. Jenkins, 215 N.C. App. 330, 333-36, 719 S.E.2d 48, 51-53 (2011), neither party cites or challenges the application of this provision even though FedEx has its principal place of business in Tennessee. (Doc. 5, ¶ 2.) Similarly, the Agreement contains a forum selection clause limiting any action to the State or federal courts in Shelby County, Tennessee. (Doc. 63-4 at 66.) Neither party has addressed this provision, either. Presumably, Irwin prefers the present forum and North Carolina law, and FedEx does not seek to rely on the Agreement because it contends the contract was never executed. Because the parties do not seek to rely on such provisions, the court deems them waived for present purposes. Guerry v. Am. Trust Co., 234 N.C. 644, 647-48, 68 S.E.2d 272, 275 (1951) (recognizing that waiver of contract provision may be inferred from conduct indicating intent to abandon it); Cargill, Inc. v. Charles Kowsky Res., Inc., 949 F.2d 51, 55 (2d Cir. 1991) (finding waiver of Massachusetts choice of law provision where both parties consistently relied on New York law in summary judgment submissions). Even if Tennessee substantive law applied, North Carolina law would still govern the question of contract formation. See Maddy v. Gen. Elec. Co., 80 F. Supp. 3d 544, 549 (D.N.J. 2015) (finding that New York choice of law provision addressed substantive law but Texas law applied to contract formation).

9

contract claim because the issue of whether an oral contract for payment of bonuses was formed was question of fact for the jury); Walker v. Goodson Farms, Inc., 90 N.C. App. 478, 369 S.E.2d 122 (1988) (finding that an offer letter, coupled with the parties' conduct, was persuasive evidence of formation of a contract, even though the parties failed to draft a formal final written agreement; lack of a written contract did not preclude creation of an enforceable agreement). "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." Nationwide v. Mnatsakanov, 191 N.C. App. 802, 805, 664 S.E.2d 13, 15 (2008) (citations omitted); see also Arndt, 170 N.C. App. at 523, 613 S.E.2d at 278 ("Whether a contract existed is a question for the jury.").

For the reasons that follow, it is apparent that irrespective of Irwin's legal theory, neither he nor FedEx is entitled to summary judgment on the contract claims.

The terms of the Agreement indicate that Irwin's consideration went well beyond his performance through continued employment and included several promises. For example, in sections 12 and 13, Irwin promised to waive any legal claims he could have asserted against FedEx as of the effective date of the Agreement; consented to various no-compete provisions; consented to confidentiality provisions; and agreed "not to do or say anything that reasonably may be expected to have the effect of disparaging

10

FedEx." (Doc. 63-4 at 62-66.) Thus, the Agreement has hallmarks of a bilateral contract under North Carolina law. Winders v. Kenan, 161 N.C. 628, 628, 77 S.E. 687, 689-90 (1913).[3]

Irwin clearly accepted the Agreement, indicating his intent to be bound by the promises therein, as he signed it in February 2013. (Doc. 63-4 at 67.) But to prove that the parties entered into a bilateral contract, he has to show that FedEx made promises in consideration for his obligations under the Agreement. White v. Hugh Chatham Mem. Hosp., 97 N.C. App. 130, 131, 387 S.E.2d 80, 81 (1990) (explaining that bilateral contracts are based upon mutual promises). FedEx argues that it made no such promises, as it never assented to the Agreement because it never signed it. (Doc. 57 at 19-25.) FedEx points to the Agreement's definition of "effective date" as "the date it is fully executed by both parties, which is [Irwin's] departure date." (Doc. 63-4 at 61.) FedEx argues that this language is unambiguous and that the Agreement by its terms never went into effect. (Doc. 57 at 21.) FedEx also cites the literature it provided employees about the VBO program that states that "the agreement is not fully executed until the company signs as well." (Id. at 10-11.) Without a contract, FedEx argues, Irwin remained an at-will employee who could be terminated

---

[3] This is also true under Tennessee law. Rode Oil Co. v. Lamar Advert. Co., No. W200702017COAR3CV, 2008 WL 4367300, at *6-8 (Tenn. Ct. App. Sept. 18, 2008).

11

at any time.  (Id. at 19.)

Irwin argues that even if FedEx did not sign the Agreement, it manifested assent through its conduct.  He cites the letter to him from a FedEx vice president confirming that the Agreement had been "accepted" (Doc. 63-4 at 68); a FedEx PowerPoint slide explaining that severance buyout contracts would be "guaranteed" after they were "accepted" (Doc. 63-7 at 18 ("Nothing is guaranteed until the process is complete and we have accepted your agreement for a buyout.")); and an email from an employee in FedEx's human resources department that Irwin's Agreement had been "executed" (Doc. 63-7 at 13).  Irwin also argues that FedEx's attempt to have him leave the company in August 2013, earlier than the Agreement's date of November 30, 2013, shows that a binding agreement existed. (Doc. 63 at 22.)  In addition, Irwin points to the termination notice he received – in particular, its statement that his participation in the VBO program was "null and void in its entirety . . . [p]ursuant to the terms of the Voluntary Buyout," language that tracks that of section 13(n) of the Agreement – as evidence that FedEx understood that the contract's terms governed the parties' relationship.  (Doc. 57-4 at 49-50; Doc. 59 at 12.) Irwin contends that the terms "execution" and "effective date" are ambiguous and can be interpreted through parol evidence, citing the foregoing materials as evidence of FedEx's assent to the Agreement.  (Doc. 63 at 23-24.)

12

The evidence that Irwin offers — including letters, emails, presentations, and other communications — are sufficient to raise a genuine dispute as to whether FedEx agreed to be bound by the Agreement and therefore whether the parties entered into a bilateral contract. Irwin signed the Agreement; the seven-day revocation period expired; FedEx later asked Irwin if he would depart in August as opposed to November, indicating an understanding that the Agreement's terms applied; and FedEx cited the VBO program in its termination letter to Irwin. FedEx's internal communications also considered the Agreement "executed." (Doc. 63-7 at 13.) In advancing its argument that it is not bound by the Agreement, FedEx relies on its refusal to sign the Agreement and the Agreement's language that the severance payment will be made only when the Agreement "has been fully executed by both parties." Under North Carolina contract law, however, neither of these arguments is dispositive. Barnhouse, 151 N.C. App. at 512, 566 S.E.2d at 133-34. FedEx gave signals to Irwin that it had "accepted" the Agreement through its communications. Because FedEx maintained possession of the Agreement, only it knew whether it had signed the Agreement. A jury could reasonably find that under these circumstances FedEx expressed its assent to the Agreement.

FedEx argues that because the Agreement plainly defined the "effective date" as Irwin's departure date, the court cannot

13

consider extrinsic evidence to interpret the term. But this ignores North Carolina contract law, which allows a court to assess whether a contract term is ambiguous in the context used. Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004) ("An ambiguity can exist when, even though the words themselves appear clear, the specific facts of the case create more than one reasonable interpretation of the contractual provisions."). In their negotiations, the parties contemplated that Irwin would work for nine months and then receive a severance package. This fact, coupled with evidence that FedEx assented to the arrangement, supports the interpretation of "effective date" to mean "when Irwin's severance becomes due" as opposed to "when Irwin accepts the Agreement." (Doc. 63 at 17.)

Alternatively, even if a factfinder were to determine that FedEx never assented to the Agreement – and therefore that no bilateral contract existed between the parties – Irwin could still claim relief under a unilateral contract theory. Guarascio v. New Hanover Health Network, Inc., 163 N.C. App. 160, 165, 592 S.E.2d 612, 615 (2004) (assessing a plaintiff's argument that his employer breached a unilateral contract after concluding that he failed to show the existence of a bilateral contract). Irwin is correct that North Carolina law permits an employer to make a unilateral offer for employment benefits. Roberts v. May Mills, 184 N.C. 406, 114 S.E. 530 (1922) (holding employer's promise to pay a bonus

to all employees who remained continuously employed until Christmas to be enforceable). The record evidence raises a genuine dispute as to whether FedEx made a unilateral offer of payment in return for Irwin's performance of continued employment. Arndt, 170 N.C. App. at 522-23, 613 S.E.2d at 277-78 (explaining that whether an oral contract was formed is a fact question to be decided by a jury); Barnhouse, 151 N.C. App. at 512, 566 S.E.2d at 133-34 (stating that the intentions of the parties, as evidenced "from both their writings and actions," control whether a contract exists and how its terms are to be constructed).

FedEx, as the master of its offer, was free to offer the benefits in the VBO program on the terms it chose, including being employed until November 30, 2013. Roberts, 184 N.C. at 406, 114 S.E. at 533. While Irwin remained an employee at will, the offer of payments through the VBO program would constitute a supplementary contract to that employment. Id. at 406, 114 S.E. at 534 ("The offer of a bonus and its acceptance by entering upon the work was a supplementary contract for a reward in consideration of the employee remaining in the service for the specified time" and thus "did not change the terms of the contract of employment by the week . . . ."); see also Pritchard v. Elizabeth City, 81 N.C. App. 543, 553, 344 S.E.2d 821, 826 (1986) (discussing an employer's representations that additional leave time would be earned in proportion to hours worked as "supplementary employment

contracts"). Therefore, FedEx's argument that it was free to terminate Irwin as an at-will employee is correct as to the benefits flowing from his at-will employment status, but the argument fails as to the contractual claim. A finding that FedEx breached a unilateral contract would allow Irwin to collect damages. Roberts, 184 N.C. at 406, 114 S.E. at 535 (allowing "payment of the bonus earned up to the time of the discharge").

FedEx's argument that it was free to withdraw the offer before full performance is mistaken. Under North Carolina law, once a unilateral offer of employment is accepted "by beginning work," it cannot be withdrawn "without good and sufficient cause." Id. at 406, 114 S.E.2d at 534 (emphasis added); accord Hamilton v. Memorex Telex Corp., 118 N.C. App. 1, 11, 454 S.E.2d 278, 283 (1995) (noting that "the employee may accept by entering or maintaining employment, and the employer cannot thereafter disavow the promise once the employee has started to work in reliance thereon"); White, 97 N.C. App. at 132-33, 387 S.E.2d at 81-82 (finding that material issues of fact existed to preclude summary judgment where plaintiff, through continued employment, accepted defendant's unilateral contract promising disability coverage). Here, Irwin had engaged in his performance continuously since at least February 2013.

Thus, if Irwin is correct that FedEx's actions and writings regarding the VBO program constituted a unilateral offer, at least

16

two things are true.  First, FedEx was not free to withdraw the offer without consequence once Irwin began performance, nor could FedEx rely on the fact that it terminated Irwin before the Agreement's "effective date."  Second, Irwin will not be entitled to summary judgment if FedEx can proffer sufficient evidence to create a genuine dispute of material fact as to whether it terminated him for "good and sufficient cause."  Roberts, 184 N.C. at 406, 114 S.E. at 534.

      **2.**  **Breach**

No matter which theory applies to Irwin's contract claim, once Irwin proffers sufficient evidence that (1) the parties entered into a bilateral contract or a unilateral contract and (2) he met the terms of his employment, the burden rests with FedEx to establish grounds for the termination.  Here, there are disputed issues of fact whether FedEx properly terminated Irwin's employment – whether pursuant to section 13(n) of the Agreement under a bilateral contract theory, or with "good and sufficient cause" under a unilateral contract theory.

Under a bilateral contract theory, the burden rests with FedEx to demonstrate that "after executing th[e] Agreement, but prior to the effective date," Irwin "engage[d] in conduct, or ha[d] performance deficiencies that would normally result in termination." (Doc. 63-4 at 66.)  As noted, because these are claims on a contract that is supplemental to Irwin's employment,

17

they are independent of FedEx's rights to terminate Irwin as an at-will employee. Under a unilateral contract theory, the burden rests with the employer to establish that it terminated the employee for "good and sufficient cause." Roberts, 184 N.C. at 406, 114 S.E. at 534 (noting that an employee who quit early forfeited all claims to the bonus but that an employer who discharged an employee "without good and sufficient cause . . . was liable to the employee for the bonus lost thereby").

Under FedEx's leadership policy, which the parties agree applied to Irwin throughout his employment, Irwin could be terminated for "leadership failure," a broad concept that allowed for an employee's termination for failure to monitor and prevent misconduct by subordinates. (Doc. 57 at 3; Doc. 57-1 at 2-7; Doc. 57-2 at 4-5; Doc. 63 at 25; Doc. 63-6 at 76-89.) FedEx contends that Irwin committed leadership failure by not exercising proper supervision and oversight (1) to prevent subordinates from wrongfully billing customers for security fees and (2) to prevent subordinates from improperly allowing customers to access certain non-revenue FedEx accounts to fly the customers' shipments using non-approved routes. (Doc. 57 at 4-9; Doc. 57-12 at 14-15.) FedEx argues that Irwin was personally involved in these practices and that the infractions continued through 2013. (Doc. 57 at 13-15; Doc. 57-11 at 25.)

Irwin denies involvement in these practices and that he

18

committed any leadership failure as defined by FedEx. (Doc. 58-8 at 3; Doc. 63 at 24-26.) According to Irwin, the employees involved in the practices were not under his supervision, the accounts and security fees were not under his responsibility, and FedEx encouraged its employees to continue charging security fees by incorporating, and thereby concealing, the fees into other charges. (Doc. 63 at 5-6, 24-26; Doc. 63-6 at 15-18.) He further contends that the accused conduct ended in 2010, years before he signed the Agreement, and thus did not occur within the timeframe of the Agreement's termination clause. (Doc. 63 at 15; Doc. 63-6 at 15.)

The parties have advanced significantly conflicting accounts of the facts underlying the claimed breach. For example, the parties disagree on Irwin's role in the security fee and non-revenue account practices. FedEx alleges that Irwin colluded with respect to the security fees and "was involved" in using the non-revenue account to move customers' freight (Doc. 61 at 7-8), while Irwin denies personal involvement in either practice (Doc. 63 at 5-6). The parties also disagree as to whether FedEx leadership, specifically Chief Financial Officer Cathy Ross, effectively communicated to subordinates to stop these practices. (Doc. 57 at 6-9; Doc. 63 at 6-10).[4]

---

[4] Irwin concedes that he received emails from superiors – which FedEx styles as "legal directives" (Doc. 57 at 6) – to cease charging customers

The parties further dispute Irwin's role and responsibilities, which may affect FedEx's ability to terminate him under its leadership policy. According to FedEx, Irwin was the "Chief Operations Officer," "the 'head guy,'" and "general manager" of CTS who was "responsible for everything that went on in the business" (Doc. 57 at 5), whereas Irwin describes himself as a "managing director" (Doc. 63 at 12). The parties agree that Irwin was the highest-ranking employee with discretion over operations at CTS's Greensboro office. (Doc. 57 at 14; Doc. 61-2 at 11.) But they disagree on whether Irwin had responsibility over the specific practice of charging customers with security fees. (Doc. 57 at 14; Doc. 61-2 at 12; Doc. 63 at 5-6.) FedEx also argues that Irwin's subordinate, Tony Rouse, was the person

---

security fees, but maintains that the charging of security fees was not his responsibility (Doc. 63-6 at 10-12, 16-18). In support of this argument, Irwin points out that he is not noted as a recipient on one of the emails to which FedEx cites. (Doc. 63-6 at 41.) Irwin also argues that his superiors did not have a clear stance on the practice of charging security fees, contending that FedEx was concerned less with the practice and more with how the charges were communicated to customers. (Doc. 63 at 7-10.) Irwin claims that FedEx wanted to preserve the revenue from security fees by "rolling" the fees into other charges. (Id.) He also claims that Russ Lilly, former Managing Director of Sales at CTS (Doc. 57-2 at 14; Doc. 63 at 12), sought clarification and attempted to square the concerns of FedEx leadership with the need to preserve revenue growth. (Doc. 63 at 13.) But FedEx employee Rick Paul never responded to requests for clarification, and because FedEx did not preserve his computer hard drive (as to which Irwin seeks an adverse inference (id. at 13)), it is unavailable. In the end, this is all further evidence of a material factual dispute on the issue of breach. Thus, the court need not decide the spoliation issue, which is otherwise not sufficiently briefed, and it will remain for the trial court to resolve.

who allowed customers to gain access to the non-revenue account. (Doc. 57 at 9, 14.)

Finally, the parties dispute when the security fee and non-revenue account practices occurred.[5] Irwin claims that the charging of security fees stopped in 2010. (Doc. 63 at 15.) Irwin does not allege a specific date by which the non-revenue account practices ended but contends that his position did not place him in a leadership role with respect to either that account or the charging of security fees after 2009. (Id. at 26.) FedEx has proffered evidence that Irwin was sufficiently involved in these practices (alleging "collusion") and that the infractions continued through 2013, within the time period set forth in section 13(n) of the Agreement. (Doc. 57 at 15; Doc. 57-11 at 25.) It also contends that it did not learn of Irwin's involvement until it received a tip and launched an investigation in mid-2013. (Doc. 61 at 6; Doc. 61-3 at 3-5, 7-8; Doc. 61-11 at 4-9.)

Thus, regardless of whether Irwin proceeds under a bilateral or unilateral contract theory, FedEx has proffered evidence from which a reasonable jury could conclude that the company terminated him within the provisions of section 13(n) of the Agreement

---

[5] Irwin raises the timing of the alleged security fee and non-revenue account misconduct in the context of his bilateral contract analysis, because section 13(n) of the Agreement provides FedEx a defense to payment for misconduct or performance deficiencies occurring after Irwin executed the Agreement but before its effective date of November 30, 2013. (Doc. 63-4 at 66.)

(bilateral contract theory) or that it had "good and sufficient cause" to revoke its offer (unilateral contract theory).

For all these reasons, the parties' cross motions for summary judgment on the breach of contract claims (Counts 1 and 5) must be denied.

**B.** **Wage and Hour Act Claims**

Irwin also advances two claims under the North Carolina WHA. (Doc. 7, ¶¶ 28-35 (Count 2), ¶¶ 61-71 (Count 6).) In sum, he alleges that FedEx violated the WHA by not paying him the $199,041.23 severance benefit set forth in section 3(a) of the Agreement (Doc. 7, ¶ 8; Doc. 63-4 at 61), the $10,486 AIC bonus set forth in section 6 (Doc. 7, ¶ 8; Doc. 63-4 at 61), the $25,000 health reimbursement payment set forth in section 3(b) (Doc. 7, ¶ 8; Doc. 63-4 at 61), and the $40,000 long term incentive cash pay-out set forth in section 8 (Doc. 7, ¶ 8; Doc. 63-4 at 62).

FedEx advances several arguments as to why it should be granted summary judgment on Irwin's claims. It contends that in December 2013 it paid Irwin all earnings and wages to which he was entitled.[6] (Doc. 57 at 26; Doc. 57-9 at 3-10.) It further argues that the severance buyout program falls outside the scope of the WHA, as FedEx does not have a "policy or practice" of making the

---

[6] FedEx has submitted copies of Irwin's payroll history. These records indicate that Irwin continued to earn his regular wages after he signed the Agreement, at amounts equal to what he was earning before he signed the contract. (Doc. 57-9 at 3-10.) Irwin does not claim that FedEx failed to pay him his regular wages.

payments set forth in the Agreement. (Doc. 57 at 26.) Finally, FedEx argues that Irwin's claims fail because he did not earn the payments he seeks. (Id. at 27.) Irwin responds that FedEx had a policy and practice of making severance buyout payments to accepted participants and that regardless, FedEx's promise of wages to him is binding. (Doc. 63 at 18-19.)

The WHA prevents employers from denying their employees earned wages. Hamilton v. Memorex Telex Corp., 118 N.C. App. 1, 8-10, 454 S.E.2d 278, 282 (1995). The WHA defines wages as "compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation" and includes "sick pay, vacation pay, severance pay, commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments." N.C. Gen. Stat. § 95-25.22; Murphy v. First Union Capital Mkts. Corp., 152 N.C. App. 205, 210, 567 S.E.2d 189, 192-93 (2002). Earned wages are "those wages and benefits due when the employee has actually performed the work required to earn them." Whitley v. Horton, No. COA03-1459, 2005 WL 351143, at *5 (N.C. App. 2005) (emphasis in original); see also Narron v. Hardee's Food Sys., Inc., 75 N.C. App. 579, 583, 331 S.E.2d 205, 207-08 (1985), overruled on other grounds by J & B Slurry Seal Co. v. Mid-S. Aviation, Inc., 88 N.C. App. 1, 362 S.E.2d 812 (1987).

Outside a contractual recovery, Irwin was not eligible for

23

the benefits he claims.  Neither party disputes this.  As for the AIC and long term incentive payments,[7] FedEx's normal policy required that an employee be employed in May 2014 to be eligible for payment.  (Doc. 61-10 at 5, 8.)  So, even though these benefits would ordinarily constitute wages under the WHA, under no circumstance would Irwin have met this requirement, as his last day of employment was to have been November 30, 2013.  (Doc. 63-4 at 61.)  Thus, if a jury were to conclude that FedEx never assented to the Agreement, Irwin would have no claim to these benefits under the WHA.

Therefore, Irwin's only claim to these and the other severance benefits arises under a contract recovery.  That is to say, because it is clear that he did not actually perform the work necessary to earn those benefits – having been terminated before the November 30, 2013 effective date – his remedy lies with the Agreement or a unilateral contract, and his attempt to transform his contractual damages into wages makes his WHA claim "fatally deficient."  Cole v. Champion Enters., Inc., 496 F. Supp. 2d 613, 626 n.7 (M.D.N.C. 2007) (finding that plaintiff's "Wage and Hour Act claim is fatally deficient because he is attempting to transform alleged contractual damages into a claim for wages under the Act" and that because "at

---

[7] Technically, Irwin seeks $40,000 "in lieu of" the long term incentive payment otherwise paid to non-VBO employees.  (Doc. 7, ¶ 53; Doc. 63-4 at 62.)

24

the time of his . . . termination, [he] had not performed the work required to earn the wages and bonuses he alleges, any possible remedy could only lie in breach of contract, not the Wage and Hour Act."), aff'd, 305 F. App'x 122 (4th Cir. 2008).

Consequently, because Irwin's remedy for the damages he seeks lies under his breach of contract claims, the court will deny Irwin's motion for summary judgment and grant FedEx's motion for summary judgment as to Irwin's WHA claims.

### C. <u>Fraud Claim</u>

FedEx moves for summary judgment as to Count 4, which alleges that FedEx made false representations upon which Irwin relied "to induce him to remain a senior manager at a time of transition and to induce him to refrain from pursuing other job opportunities or competing against Defendant." (Doc. 7, ¶ 43.) Irwin argues that he was "persuaded to take early retirement by the threat that he might lose his job in a layoff, as well as by the inducement of severance." (Doc. 63 at 32.)

Irwin points to several facts indicating fraud, the most notable being the following: his claim that FedEx induced him to join the severance buyout program by threatening to terminate his position; the timing of his termination on November 27, 2013, to take effect only two days later and only one day before the Agreement's effective date when all benefits would be due; the fact that FedEx asked him to leave in August 2013 instead of

25

November 2013; the fact that FedEx implemented the VBO program as a way to cut costs; and FedEx's admission that the steering committee responsible for the program "probably" would have discussed the fact that Irwin declined to take an early August departure. (<u>Id.</u> at 31-33.) Irwin argues that FedEx intentionally reserved the option to deny him his severance by not signing the contract and by "fall[ing] back on the protection of 13(n)." (<u>Id.</u> at 32.) Irwin also alleges that the "head legal official" instructed that Irwin be suspended before the investigation concluded. (<u>Id.</u>)

FedEx argues that Irwin has failed to proffer sufficient evidence to demonstrate fraud. It argues that Irwin was not induced into, but volunteered for, the severance buyout program. (Doc. 57 at 33-34.) It also contends that Irwin has failed to cite any fraudulent statement made to him or any evidence of FedEx's intent to deceive. (<u>Id.</u>)

To prove fraud under North Carolina law, a plaintiff must show (1) a false representation or concealment of a material fact that is (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) which results in damages to the injured party. <u>Ragsdale v. Kennedy</u>, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). A plaintiff seeking punitive damages, like Irwin (Doc. 7, ¶ 51), must prove these elements by clear and convincing evidence. N.C. Gen. Stat. § 1D-15; <u>Hudgins</u>

26

v. Wagoner, 204 N.C. App. 480, 493, 694 S.E.2d 436, 446 (2010).
At the pleadings stage, the court noted that Irwin's claim is
actionable, if at all, as promissory fraud. (Doc. 14 at 5-13.)
To prove that, this court noted, he must show not only that the
promise was made with an intent to deceive him, but that FedEx had
no intent at the time to comply. Johnson v. Phoenix Mut. Life
Ins. Co., 300 N.C. 247, 254-55, 266 S.E.2d 610, 616 (1980),
questioned in part on other grounds, Myers & Chapman, Inc. v.
Thomas G. Evans, Inc., 323 N.C. 559, 374 S.E.2d 385 (1988). The
court found that Irwin's allegations were sufficient to allege a
plausible claim under Federal Rule of Civil Procedure 9(b). (Doc.
14 at 12.)

     But this is the summary judgment stage. Even assuming that
FedEx was intentionally deceptive in leading Irwin to believe it
had executed the Agreement, the evidence proffered, when viewed in
the light most favorable to Irwin, would not permit a jury to
reasonably find that FedEx made the promises for severance with a
specific intent not to comply. Hoyle v. Bagby, 253 N.C. 778, 781,
117 S.E.2d 760, 762 (1961) (finding the promise to pay must have
been made "with the present intent not to carry it out"). Having
produced no direct evidence that FedEx never intended to honor its
promises if he met the terms of the VBO program, Irwin points to
a collection of circumstantial evidence, which alone is not fatal.
At best, however, the record, taken as a whole, supports the

inference that FedEx intended to preserve its option to treat all severance employees - including Irwin - as at-will employees throughout their severance period. (Doc. 63-7 at 2-5.) FedEx did this by not executing the employees' agreements until the employees completed their service for severance payments. (Id.) While this strategy may be questionable and seems to conflict with portions of the Agreement (e.g., section 13(n) providing for termination for cause), FedEx in fact honored all of its other severance agreements, many for payments in excess of those in Irwin's Agreement. (Doc. 61-8 at 3; Doc. 63-7 at 4.) Moreover, while Irwin is correct that FedEx sought to end his severance employment in August 2013 (some three months early), the proposed date was, in fact, one of three other severance dates instituted for all employees in the VBO program. (Doc. 63-4 at 2.) More importantly, there is no dispute that at the time FedEx made that invitation, it told Irwin it would honor the Agreement. (Doc. 7, ¶ 9.)

In the end, Irwin's claim for promissory fraud rests on his disagreement with the merits of his termination and the timing of the announcement just before the severance payments would have been due. This has led to his suspicion that the company must have had another reason to fire him. (Doc. 57-3 at 24; Doc. 63 at 33.) Even if it was for mere cost savings, this is insufficient to support the further inference that FedEx never intended to comply at the outset, especially in light of the fact that

28

severance buyout programs by their nature seek to facilitate cost savings and the record evidence of the company honoring all other agreements.[8]  *Norman v. Tradewinds Airlines, Inc.*, 286 F. Supp. 2d 575, 595 (M.D.N.C. 2003) (dismissing promissory fraud claim, noting that "the promissor must do something more than just disregard or break its promises").

Because Irwin has failed to proffer sufficient evidence from which a reasonable jury could find in his favor on this claim, *Anderson*, 477 U.S. at 248 (asking whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" when assessing a motion for summary judgment), FedEx's motion for summary judgment on Irwin's fraud claim will be granted.

### D. UDTPA Claim

Finally, the complaint alleges that FedEx violated North Carolina's UDTPA by "engag[ing] in misrepresentations, deception, fail[ing] to fairly and adequately investigate, and us[ing] wrongful accusations as a pretext to attempt to deny [him] compensation he was promised and is owed." (Doc. 7, ¶ 37.) Irwin contends that his termination was a ruse designed to allow FedEx

---

[8] FedEx also argues that Irwin's fraud claim is barred by North Carolina's three-year statute of limitations, N.C. Gen. Stat. § 1-52(9), to the extent Irwin relies on the elimination of his job with CTS in 2009. (Doc. 57 at 33.) While the record indicates, indeed Irwin alleges, that his position with CTS was eliminated in 2009 when CTS was merged into FedEx, he thereafter suspended his negotiations for a severance package in order to stay on with FedEx, which he did until the current events. (Doc. 7, ¶ 6.) Thus, the claim relies on conduct in 2012-13 as part of FedEx's VBO program, and this argument is therefore moot.

to avoid paying the severance required under the Agreement. (Doc. 63 at 26-30.) He also argues that he was not given the opportunity to defend himself during FedEx's investigation and notes that other FedEx employees who were cited for "leadership failure" for the same conduct leading to his termination were not terminated. (Id.) FedEx responds by arguing that Irwin's claim falls outside the scope of the UDTPA and, in any event, Irwin fails to proffer sufficient evidence to demonstrate any unfair or deceptive conduct. (Doc. 57 at 27-32.) Rather, it argues, Irwin merely questions FedEx's business judgment in terminating him. (Id. at 30-31.)

FedEx is correct that Irwin's claim falls outside the scope of the UDTPA. To establish a UDTPA claim, a plaintiff must show (1) that a defendant committed an unfair or deceptive act or practice (2) in or affecting commerce and (3) resulting in injury to the plaintiff. First Atlantic Mgmt. Corp. v. Dunlea Realty Co., 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998) (citing Canady v. Mann, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (1992)). Whether an act is "in or affecting commerce" is a question of law. Hardy v. Toler, 288 N.C. 303, 310, 218 S.E.2d 342, 346-47 (1975).

Although the UDTPA broadly defines "commerce" to include "all business activities, however denominated," North Carolina courts have long held that the statute "is not intended to apply to all

30

wrongs in a business setting." <u>HAJMM Co. v. House of Raeford Farms, Inc.</u>, 328 N.C. 578, 593, 403 S.E.2d 483, 492-93 (1991). Rather, it has been interpreted to apply to all interactions between businesses and interactions between businesses and consumers. <u>White v. Thompson</u>, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). This has led North Carolina courts to hold consistently that absent conduct affecting commerce beyond the employment relationship, employer-employee disputes are not sufficiently "in or affecting commerce" to satisfy the second element of a UDTPA claim. <u>See, e.g.</u>, <u>White</u>, 364 N.C. at 53, 691 S.E.2d at 680 (noting that "the General Assembly did not intend for the Act to intrude into the internal operations of a single market participant"); <u>Gress v. Rowboat Co.</u>, 190 N.C. App. 773, 775-76, 661 S.E.2d 278, 281-82 (2008) ("As a general rule, there is a presumption against unfair and deceptive practice claims as between employers and employees." (internal citations omitted)); <u>Kinesis Adver., Inc. v. Hill</u>, 187 N.C. App. 1, 21, 652 S.E.2d 284, 298 (2007) ("We have consistently held that the employer/employee relationship does not fall within the intended scope and purpose of [N.C. Gen. Stat. § 75-1.1]."); <u>Buie v. Daniel Int'l Corp.</u>, 56 N.C. App. 445, 448, 289 S.E.2d 118, 119-20 (1982) (holding that "employer-employee relationships do not fall within the intended scope of G.S. 75-1.1"); <u>cf.</u> <u>Sara Lee Corp. v. Carter</u>, 351 N.C. 27, 34, 519 S.E.2d 308, 312-13 (1999) (finding UDPTA violations where

31

an employee engages in commerce by selling parts and services to his employer from companies owned by the employee); <u>Wilson v. Wilson-Cook Med., Inc.</u>, 720 F. Supp. 533, 542 (M.D.N.C. 1989) (dismissing UDTPA claim based on plaintiff's termination because, among other grounds, the act does not apply to employer-employee relationships, but permitting it to proceed as claim for failure to pay dividends).[9]

Here, Irwin does not allege or proffer evidence of any factor affecting commerce outside his unique employment dispute with FedEx.[10] Therefore, his UDTPA claim fails to meet the second prong requiring that it involve conduct "in or affecting commerce." Accordingly, FedEx's motion for summary judgment as to this claim

---

[9] Irwin relies solely on <u>Johnson v. Colonial Life & Accident Ins. Co.</u>, 173 N.C. App 365, 618 S.E.2d 867 (2005), where the court, without discussion, affirmed an award under the UDTPA on an employee's claim against his employer. (Doc. 63 at 26-31.) The court's discussion was limited to whether there was evidence that the defendant-employer's conduct was sufficiently aggravating. Whether the parties deemed the defendant's decision to submit a fraud report concerning the plaintiff's conduct to the North Carolina Department of Justice as sufficient to overcome the employer-employee exception is not revealed. Regardless, no court has cited <u>Johnson</u> for the proposition that an employment dispute — without additional allegations of an effect on commerce — is cognizable under the UDPTA.

[10] Even the presence of the covenant not to compete in the Agreement, which Irwin does not challenge, would not provide a sufficient ground to meet the "in or affecting commerce" element. <u>See</u> <u>Kinesis Advert., Inc. v. Hill</u>, 187 N.C. App. 1, 21, 652 S.E.2d 284, 298 (2007) ("Indeed, we have specifically held that a violation of a covenant-not-to-compete, essentially a breach of contract within the employer/employee relationship, lies outside the scope of the UDTP."); <u>Am. Marble Corp. v. Crawford</u>, 84 N.C. App. 86, 88, 351 S.E.2d 848, 849-50 (1987) (affirming trial court's finding that employee claim based on covenant not to compete falls outside UDTPA).

(Count 3) will be granted.

## III. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED that Irwin's motion for partial summary judgment (Doc. 58) on his breach of contract and WHA claims is DENIED. FedEx's motion for summary judgment (Doc. 56) is GRANTED IN PART and DENIED IN PART, as follows: FedEx's motion is GRANTED with respect to Irwin's claims for common law fraud (count 4), violations of the WHA (counts 2 and 6), and violations of the UPTPA (count 3), and those claims are therefore DISMISSED; FedEx's motion is DENIED with respect to Irwin's breach of contract claims (counts 1 and 5), which shall proceed as the remaining claims for trial.

                                    /s/   Thomas D. Schroeder
                              United States District Judge

December 5, 2016